**UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA**

| | |
|---|---|
| United States of America, | Court File No. 12-CR-294 (DWF/TNL) |
| Plaintiff, | |
| v. | **REPORT & RECOMMENDATION** |
| Marquis Leval Cotton, | |
| Defendant. | |

Richard Newberry, Assistant United States Attorney, **UNITED STATES ATTORNEY'S OFFICE**, 300 South Fourth Street Suite 600, Minneapolis, MN, for the United States of America; and

Andrew H. Mohring, **OFFICE OF THE FEDERAL DEFENDER**, 300 South Fourth Street, Suite 107, Minneapolis, MN, for Defendant.

This matter is before the Court, Magistrate Judge Tony N. Leung, on Defendant Marquis Leval Cotton's Motion to Suppress (ECF No. 22). Defendant is charged with possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(4), and 924(e). Richard Newberry appeared on behalf of the Government, and Andrew H. Mohring represented Defendant. The Court heard testimony from Officer Mark Suchta and Sergeant Jeffrey Egge. The Court received the following exhibits: Government Exhibit 3 is a Meeting Agenda for Plymouth Avenue Townhomes & Apartments for February 27, 2012; Government Exhibit 4 is an April 18, 2012 letter to Plymouth Avenue Townhomes and Apartments residents from the property manager Heidi Mindestrom; Defendant's Exhibit 1 is Officer Suchta's written report concerning the events of April 30, 2012; Defendant's Exhibits 2a is a map of the area around 1515 Plymouth Avenue North,

Minneapolis, Minnesota; Defendant's Exhibit 2b is a satellite image of 1515 Plymouth Avenue North; Court Exhibit 1 is a map showing five-year gun crime "hot blocks" (spanning from 2007 to 2011) and ten-year gun crime "hot blocks" (spanning from 2000 to 2010) around 1515 Plymouth Avenue North, Minneapolis, Minnesota; and Court Exhibit 2 is a map showing gun crime reports from January to September, 2012, in the area around 1515 Plymouth Avenue North, Minneapolis, Minnesota. The Court took the issue under consideration following the hearing.

I. FACTS

Officer Mark Suchta and his partner Officer Kocher[1] patrolled the area around the Plymouth Avenue Townhomes and Apartments in North Minneapolis as part of a department-approved off-duty assignment. Tr. 11-12. While they patrolled, the officers wore full police uniforms and drove a marked Minneapolis Police Department squad car. Tr. 11.

Officer Suchta had been working as a police officer in north Minneapolis for eight years. Tr. 11. He testified that the area he and Officer Kocher were patrolling had been "plagued with narcotic activity, robberies, shootings, all type of quality of living arrests" and called it "a very violent area." Tr. 15. To address some of these concerns, Plymouth Avenue Townhomes and Apartments held a meeting for all residents on February 27, 2012, to address security concerns, including "[g]iving keys to [n]on residents to gain access ([t]hrowing off balcony)." Gov't Ex. 3. On April 18, 2012, property manager Heidi Mindestrom sent a letter to residents reminding them that "under no circumstances"

---

[1] The record does not reflect Officer Kocher's first name.

should they throw keys off their balconies to non-residents. Gov't Ex. 4. Officer Suchta testified that the company began imposing this restriction because throwing keys to persons outside the building compromises the integrity and security of the building. Tr. 12-13.

On April 30, 2012, at about 11 a.m., Officers Suchta and Kocher saw a person from the third floor balcony of 1515 Plymouth Avenue North throw a set of keys to two men on the ground below, Defendant and another, unidentified man. Tr. 13-14. Upon seeing this, Officer Kocher yelled to the two men outside the building that they were not allowed to take the keys. Tr. 14. Notwithstanding Officer Kocher's admonition, the unidentified man picked up the keys and quickly went to the back door of 1515 Plymouth and started to unlock it. *Id.* Officer Suchta yelled, "Stop." *Id.* The unidentified male did not stop, but unlocked the door, entered the building, and shut the door behind him. *Id.* Defendant did not move, and Officer Suchta walked quickly towards Defendant. Tr. 14-15, 28.

As Officer Suchta approached, he saw what he interpreted as a nervous look on Defendant's face. Tr. 15. Officer Suchta saw Defendant make a motion with his hands to his front waistband. *Id.* Based on his experience in the area and his observations, Officer Suchta testified that he believed Defendant was reaching for a weapon. *Id.* Officer Suchta then "wrapped up" Defendant's arms behind him, walked him to the squad car, laid his torso on the hood of the car, handcuffed him, and stood him upright. *Id.* At this point, Officer Kocher pulled a black and silver pistol from Defendant's front waistband. *Id.*

Defendant is charged with being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2), and 924(e). He now moves to suppress all evidence resulting from the April 30 detention and search, arguing that the officers' actions were not supported by reasonable articulable suspicion or probable cause. The Government opposes the Motion, arguing (1) the initial encounter between Officer Suchta and Defendant was voluntary until Suchta wrapped Defendant's arms behind him; and (2) Officers Suchta and Kocher conducted a lawful *Terry* stop on Defendant.

II. ANALYSIS

### A. Officer Suchta's Encounter with Defendant Was Not Voluntary

The Government argues that the encounter between Defendant and Officers Suchta and Kocher was voluntary until Officer Suchta wrapped up Defendant's arms. Not all encounters between law enforcement and citizens implicate Fourth Amendment protections. *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). Such a determination is made on a case-by-case basis by determining circumstances including but not limited to: officers positioning themselves to limit the person's freedom of movement; the presence of several officers; the display of weapons by officers; physical touching; the use of language or intonation indicating that compliance is necessary; the officers retention of the person's property; an officer's indication that the person is the focus of a particular investigation; and whether the person submitted to an assertion of authority. *California v.*

*Hodari D.*, 499 U.S. 621, 626 (1991) ("An arrest requires *either* physical force . . . *or*, where that is absent, *submission* to the assertion of authority." (emphasis in original)); *United States v. Griffith*, 533 F.3d 979, 983 (8th Cir. 2008) (listing non-exclusive factors for courts to consider).

The Government compares the facts of this case to those of *United States v. Griffith*, 553 F.3d 979 (8th Cir. 2008). In *Griffith*, officers were patrolling the parking lot of a housing development that had a history of trespassers. The officers initially drove past the parked car in which Griffith was passenger, and then returned moments later. They parked their patrol car so as not to block in the suspect car and approached. One of the officers approached the driver's window and spoke with the driver; the other walked around the back of the vehicle. After receiving evasive answers and noting that the driver appeared irritated, the officers directed the driver to sit on the curb while they questioned Griffith, the passenger. As the officer approached the vehicle, he and his partner observed Griffith leaning forward as if he was putting something under the front seat. The officers placed their hands on their weapons, ordered Griffith to show his hands, and asked Griffith to identify himself. Griffith gave his name and date of birth, and when asked if he was on the housing authority trespass list, said, "Why don't you just find out." The officers confirmed that Griffith was on the trespass list and arrested him for trespassing. The officers then performed a search-incident-to-arrest and found a loaded handgun under the passenger seat of the car.

In evaluating Griffith's motion to suppress, the Eighth Circuit determined that the initial encounter with police was voluntary because "the actions of the officer in

5

connection with the initial encounter were insufficient to lead a reasonable person to believe his liberty was restrained." *Id.* at 983. Griffith made no attempt to leave or avoid the encounter, and the officers did not block his exit or impede the driver's ability to drive away. *Id.* The officers "did not draw their weapons, touch, intimidate the [defendant], or demand that [he] comply with the investigation." *Id.* On these facts, the court found that, under the totality of the circumstances, the initial encounter was consensual. *Id.*

The facts of this case are different from *Griffith* in several respects. Important to this Court's analysis is the language used by Officer Suchta at the beginning of the encounter. Officer Suchta did not ask to speak to the two men; he yelled "Stop." Although Officer Suchta testified that he was yelling it only at the man who ran into the apartment complex and not at Defendant, Defendant would have heard a uniformed police officer yell "stop" in his direction and then walk quickly towards him. In those circumstances, a reasonable person would not believe that he was free to "'ignore the police presence and go about his business.'" *Florida v. Bostick*, 501 U.S. 429, 473 (1991) (quoting *Michigan v. Chesternut*, 486 U.S. 567, 569 (1988)); *see also United States v. Richardson*, 427 F.3d 1128, 1132 (2005) (listing as one of the criteria for finding that the defendant had not been seized the fact that "[n]either officer . . . told [him] to stop"). Based on the totality of the circumstances, Defendant submitted to Officer Suchta's assertion of authority. Accordingly, the Court determines that Defendant was seized when he submitted to Officer Suchta's oral command to stop.

### B. Reasonable, Articulable Suspicion Supported the *Terry* Stop

#### 1. Officer Suchta Had Reasonable, Articulable Suspicion When He Yelled "Stop"

Although Defendant's encounter with Officer Suchta was not voluntary, his seizure would be nonetheless reasonable under the Fourth Amendment if the officers had a reasonable articulable suspicion of criminal activity. *Terry v. Ohio*, 392 U.S. 1, 30 (1968). "Where a police officer has reasonable suspicion that criminal activity may be afoot, the officer may briefly stop an individual and make reasonable inquiries aimed at confirming or dispelling the suspicion." *United States v. Hughes*, 517 F.3d 1013, 1016 (8th Cir. 2008) (citing *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993)). In determining whether an officer had a "'particularized and objective basis' for suspecting legal wrongdoing," courts look at the totality of the circumstances, including the character of the surrounding neighborhood and the officers' experience and training. *See United States v. Arvizu*, 534 U.S. 266, 273 (2002); *Illinois v. Wardlow*, 528 U.S. 119 (2000).

Based on the totality of the circumstances, the Court finds that Officer Suchta had an objectively reasonable, articulable suspicion that criminal activity was afoot when he yelled "Stop" in Defendant's direction. Officer Suchta credibly testified that he had eight years of experience patrolling North Minneapolis and knew that this area had been "plagued with narcotic activity, robberies, shootings, [and] all type of quality of living arrests." Tr. 15. Defendant's presence in a high-crime area is, of course, insufficient on its own to generate reasonable suspicion. *See Brown v. Texas*, 443 U.S. 47, 52 (1979).

7

But, under the total circumstances of this case, (1) Defendant's presence in a high-crime area, (2) the throwing of keys from the third floor to persons outside the building contrary to the property owner's rules, and (3) the unidentified male companion picking up the keys, going quickly to the building, ignoring Officer Suchta's order to stop, opening the door with the keys, and pulling the door shut, there are sufficient facts to generate reasonable suspicion. *See United States v. Bailey*, 417 F.3d 873, 877 (8th Cir. 2005).

Defendant argues that his behavior could not have aroused reasonable suspicion because none of his behavior was illegal. Completely legal behavior, however, can be sufficient to generate reasonable articulable suspicion. *See Terry*, 392 U.S. 1. Considering the totality of the circumstances in this case, Officer Suchta had a reasonable, articulable suspicion that criminal activity was afoot. Accordingly, Officer Suchta's seizure of Defendant when he yelled "Stop" was supported by reasonable, articulable suspicion.

### 2. Officer Suchta Had Reasonable Suspicion that Defendant Was Armed and Dangerous

When he approached Defendant, Officer Suchta credibly testified that he saw Defendant make a motion to his waistband. Officer Suchta immediately "wrapped up" Defendant's arms behind him, walked him over to the squad car, and handcuffed him. "When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, the officer may conduct a patdown search to determine whether the person is in fact carrying a weapon." *Hughes*, 517 F.3d at 1016 (internal quotations omitted). No "neat set of legal rules" guides courts in determining whether requisite reasonable

suspicion exists to justify a protective frisk, *Ornelas v. United States*, 517 U.S. 690, 695-96 (1996); rather, it is a totality of the circumstances analysis. *E.g., United States v. Bailey*, 417 F.3d 873, 877-78 (8th Cir. 2005). "As part of a lawful *Terry* stop, officers may take any measures that are reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *United States v. Smith*, 648 F.3d 654, 659 (8th Cir. 2011) (citations and quotation omitted).

Officer Suchta credibly testified that as he approached, Defendant "made a motion with his hands to his front waistband." Based on his experience, his knowledge of the neighborhood, his observation of Defendant and the other man engaging in behavior that suggested that criminal activity might be afoot as articulated above, the other man's immediate flight from police, and Defendant's nervous look and act of reaching for his waistband, Officer Suchta reasonably believed that his life was in danger and that Defendant was reaching for a weapon. Officer Suchta immediately restrained Defendant and placed him in handcuffs. *See United States v. Cervantes-Flores*, 421 F.3d 825, 830 (9th Cir. 2005) ("Where a suspect threatens physical danger . . . , officers may use handcuffs in the course of a *Terry* stop."). Officer Kocher performed a pat-down on Defendant's front waistband area and discovered a black and silver handgun. Based on the totality of the circumstances, the Court determines that a reasonable suspicion existed for Officer Suchta to believe that Defendant was armed and dangerous, and Defendant's Motion must be denied.

### III. RECOMMENDATION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant Marquis Leval Cotton's Motion to Suppress (ECF No. 22) be **DENIED**.


Date: June 11, 2013                    s/ Tony N. Leung
                                       Tony N. Leung
                                       United States Magistrate Judge
                                       District of Minnesota

                                       *United States v. Cotton*
                                       File No. 12-cr-294 (DWF/TNL)

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and by serving upon all parties written objections that specifically identify the portions of the Report to which objections are made and the basis of each objection. This Report and Recommendation does not constitute an order from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals. Written objections must be filed with the Court before **June 25, 2013**.